## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

ROSELIA GONZALEZ, JOSH BROTHEIM,
NATHANIEL GRIFFIN, DEBBIE PADGETT,
MICHELLE COX, MILTON KING, on Behalf
of Themselves and All Others Similarly
Situated,

               Plaintiff,

v.

UNITI SERVICES LLC, D/B/A KINETIC

               Defendant.

Case No. **4:26CV473-KGB**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 0 8 2026

TAMMY H. DOWNS, CLERK
By:_____
                         DEP CLERK

Plaintiffs Roselia Gonzalez, Josh Brotheim, Nathaniel Griffin, Debbie Padgett, Michelle Cox, and Milton King ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendant Uniti Services LLC, d/b/a Kinetic ("Kinetic" or "Defendant"). Kinetic owns and manages a website located at www.gokinetic.com/ (the "Website"), which provides visitors with access to information about internet services, promotional offers, service plans, account management tools, and other consumer-focused content.

## NATURE OF THE ACTION

1.     Courts have recognized that opaque digital tracking practices threaten consumer privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of a basic expectation of privacy in online activity.

2.     Defendant Kinetic owns and operates the Website, which allows visitors to browse information about internet and telecommunications services, view promotional offers and service plans, manage customer accounts, and access customer support and other consumer-focused

This case assigned to District Judge _Baker_
and to Magistrate Judge _Erwin_

1

content. The Website provides a cookie notice that informs users that the Website makes use of cookies on the Website, with a link redirecting to the Website's Privacy Policy. The Website's Privacy Policy outlines its use of cookies, web beacons, and other tracking technologies, noting that Defendant defines "cookies" as "small, encrypted data strings our server writes to your hard drive that contains your unique Kinetic User ID" while "web beacons" are defined as "small graphic images imbedded in a webpage or email."

3.      Defendant begins placing and transmitting third-party tracking technologies, including cookies and web beacons, immediately upon a visitor's initial visit to the Website before visitors receive any meaningful notice or opportunity to control the interception or dissemination of their data. Defendant's definition of web beacons omits its use of pixels, web beacons that appear as small graphic images, but actually contain code that call to third-party code libraries which are injected into the user's browser, allowing Kinetic to transmit visitors' electronic communications and online activity via URLs, metadata, and cookies to third-party advertising and analytics companies (the "Tracking Entities"), including Meta (also referred to as Facebook), and Google. Defendant's use of cookies, web beacons, and similar tracking tools (the "Tracking Tools") enables Tracking Entities to monitor visitors' activity, including webpage browsing activity, viewing specific products, and initiating checkout to purchase products, across the Website in real time and associate that activity with persistent identifiers. These practices constitute an unlawful interception of electronic communications, and deprive visitors of control over their Sensitive Information, resulting in concrete injury sufficient to confer Article III standing.

4.      This tracking captures and transmits: (1) Sensitive Information contained in cookies, including identifiers that link to users' Facebook profiles; (2) detailed interaction and

behavioural data, including links, buttons, forms, and other on-page elements interacted with by visitors, as well as information entered into search fields; (3) routing and addressing information, including location information, IP addresses, and persistent identifiers used to identify the source of communications and the destination for the data; and, (4) device and technical identifiers such as device type, operating system, browser type, visitor identifiers that enable recognition across sessions and websites, and approximate geolocation data. The Tracking Entities use this data to infer visitors' interests, preferences, age, or other characteristics based on the visitors' behaviour on the Website. Collectively, this information is referred to herein as "Sensitive Information."

5.      Plaintiffs accessed and used Defendant's Website on multiple occasions for its intended consumer purposes, including managing their Kinetic accounts, reviewing service information, scheduling or managing technician appointments, and engaging in other service-related activities. Plaintiffs' visits to the Website occurred while they were physically located in Georgia. During those visits, Plaintiffs' communications with the Website—including browsing activity, service selections, and related interactions—were intercepted, recorded, and transmitted to third-party Tracking Entities without Plaintiffs' knowledge or informed consent, and immediately correlated with Plaintiffs' identities. Plaintiffs did not authorize any Tracking Entity to monitor, record, intercept, or disclose their website communications. Defendant's conduct allowed the Tracking Entities to unlawfully intercept and use Plaintiffs' Sensitive Information, and Defendant misrepresented the Website's data-collection practices. In doing so, Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.; as well as common-law prohibitions against invasion of privacy, unjust enrichment, and related statutory and common-law protections. Plaintiffs bring this action on behalf of themselves and a class of similarly situated visitors harmed by Defendant's deceptive and unlawful surveillance practices.

3

6.      Federal and state legislatures have recognized and addressed individuals' privacy expectations in communications transmitted over wired and electronic systems.

7.      Congress enacted the Federal Wiretap Act to prohibit the unauthorized interception of electronic communications.

8.      Defendant implemented and utilized the Tracking Tools to intercept, use, disclose, and record visitor's Sensitive Information. The Website does not provide notice of, or obtain consent for, these practices.

9.      Visitors of the Website, including Plaintiff, have an interest in maintaining control over their Sensitive Information and in preventing its misuse.

10.     Visitors of the Website have been harmed by Defendant's conduct, resulting in violations of the Federal Wiretap Act. In addition to monetary damages, Plaintiffs seeks injunctive relief requiring Defendant to either remove the Tracking Tools from the Website or obtain appropriate consent from visitors.

11.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiffs seeks relief in this action individually and on behalf of visitors of the Website for violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e), invasion of privacy, and unjust unrichment.

**<u>PARTIES</u>**

12.     Plaintiff Roselia Gonzalez is, and at all relevant times has been, a citizen and resident of the State of Georgia. Plaintiff Gonzalez maintains an account with Defendant and has subscribed to Defendant's Kinetic internet services since approximately 2021. Plaintiff accessed and used Defendant's Website for its intended consumer purposes in connection with her Kinetic services, including to review her account information, check her balance due, and view and

manage her monthly bills and invoices. Most recently, in or about October 2025, Plaintiff visited the Website while physically located in Georgia. These Tracking Tools operated without Plaintiff's knowledge or informed consent. As a result of Defendant's use of third-party Tracking Tools and its failure to provide effective and truthful disclosures regarding its data-collection practices, Plaintiff Gonzalez's Sensitive Information was intercepted and recorded unlawfully.

13.    Plaintiff Josh Brotheim is, and at all relevant times has been, a citizen and resident of the State of Georgia. Plaintiff Brotheim maintains an account with Defendant and subscribes to Defendant's Kinetic internet and television services. Plaintiff Brotheim accessed and used Defendant's Website for its intended consumer purposes in connection with his Kinetic services, including to review his account information, check his balance due, and view and manage his bills and invoices. Most recently, in or about February 2025, Plaintiff Brotheim visited the Website while physically located in Georgia. Defendant deployed third-party Tracking Tools on the Website that intercepted, recorded, and transmitted Plaintiff's Sensitive Information, including browsing activity, device identifiers, and related metadata, to third-party Tracking Entities. These Tracking Tools operated without Plaintiff Brotheim's knowledge or informed consent. As a result of Defendant's use of third-party Tracking Tools and its failure to provide effective and truthful disclosures regarding its data-collection practices, Plaintiff Brotheim's Sensitive Information was intercepted and recorded unlawfully.

14.    Plaintiff Nathaniel Griffin is, and at all relevant times has been, a citizen and resident of the State of Georgia. Plaintiff Griffin maintained an account with Defendant Kinetic until approximately January 2025. Plaintiff Griffin accessed and used Defendant's Website for its intended consumer purposes in connection with his Kinetic services, including to schedule a technician appointment. Most recently, in or about January 2025, Plaintiff Griffin visited the

Website while physically located in Georgia. Defendant deployed third-party Tracking Tools on the Website that intercepted, recorded, and transmitted Plaintiff Griffin's Sensitive Information, including browsing activity, device identifiers, and related metadata, to third-party Tracking Entities. These Tracking Tools operated without Plaintiff Griffin's knowledge or informed consent. As a result of Defendant's use of third-party Tracking Tools and its failure to provide effective and truthful disclosures regarding its data-collection practices, Plaintiff Griffin's Sensitive Information was intercepted and recorded unlawfully.

15.    Plaintiff Debbie Padgett is, and at all relevant times has been, a citizen and resident of the State of Georgia. Plaintiff Padgett maintains an account with Defendant Kinetic and subscribes to Defendant's Kinetic phone and internet services. Plaintiff Padgett accessed and used Defendant's Website for its intended consumer purposes in connection with her Kinetic services, including to review her account information, check her balance due, and view and manage her monthly bills and invoices. Most recently, in or about January 2026, Plaintiff Padgett visited the Website while physically located in Georgia. Defendant deployed third-party Tracking Tools on the Website that intercepted, recorded, and transmitted Plaintiff's Sensitive Information, including browsing activity, device identifiers, and related metadata, to third-party Tracking Entities. These Tracking Tools operated without Plaintiff Padgett's knowledge or informed consent. As a result of Defendant's use of third-party Tracking Tools and its failure to provide effective and truthful disclosures regarding its data-collection practices, Plaintiff Padgett's Sensitive Information was intercepted and recorded unlawfully.

16.    Plaintiff Michelle Cox is, and at all relevant times has been, a citizen and resident of the State of Georgia. Plaintiff Cox maintains an account with Defendant Kinetic and has subscribed to Defendant's Kinetic internet services for more than two years. Plaintiff Cox

accessed and used Defendant's Website for its intended consumer purposes in connection with her Kinetic services, including to review her account information, check her balance due, and view and manage her bills and invoices. Most recently, in or about November 2025, Plaintiff Cox visited the Website while physically located in Georgia. Defendant deployed third-party Tracking Tools on the Website that intercepted, recorded, and transmitted Plaintiff Cox's Sensitive Information, including browsing activity, device identifiers, and related metadata, to third-party Tracking Entities. These Tracking Tools operated without Plaintiff Cox's knowledge or informed consent. As a result of Defendant's use of third-party Tracking Tools and its failure to provide effective and truthful disclosures regarding its data-collection practices, Plaintiff Cox's Sensitive Information was intercepted and recorded unlawfully.

17.    Plaintiff Milton King is, and at all relevant times has been, a citizen and resident of the State of Georgia. Plaintiff King has never maintained an account with Defendant and has never subscribed to or used Defendant's internet or other services. In or about February 2025, while physically located in Georgia, Plaintiff visited Defendant's Website for the limited purpose of exploring available internet service options as a prospective customer. As a result of Defendant's use of third-party Tracking Tools and its failure to provide effective and truthful disclosures regarding its data-collection practices, Plaintiff King's Sensitive Information was intercepted, transmitted, and recorded unlawfully.

18.    Uniti Services LLC is a Delaware corporation headquartered in Little Rock, Arkansas. Kinetic owns and operates the Website https://www.gokinetic.com/, through which it markets and provides information regarding its Kinetic internet and telecommunications services, including service plans, promotional offers, and bundled products, and allows visitors to manage customer accounts and access customer support resources. Kinetic generates revenue through the

sale and provision of internet and telecommunications services to consumers. In connection with its operation of the Website, Kinetic deploys and permits Tracking Entities that collect, intercept, and transmit visitors' browsing activity, interactions, and device identifiers to advertising, analytics, and marketing partners.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e).

20.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District.

21.     Venue is proper in this Court because Defendant is headquartered in Little Rock, Arkansas in this District.

## FACTUAL ALLEGATIONS

I.     **How Websites Function**

22.     Websites are hosted on servers, in the sense that their files are stored on and accessed from publicly accessible servers, where the server may also run software to manage and monitor the website. However, websites are, in large part, "run" on a visitor's internet browser, as the browser loads and processes the webpage's code to display the webpage and run various

code scripts that provide certain functionality to the website. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

23.     Each webpage has a unique address in the forms of uniform resource locator (URL), internet protocol address (IP address), and path. Two webpages cannot be stored at the same address.[2]

24.     When a visitor navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the URL), that visitor's browser contacts the DNS (Domain Name System) server, which translates the URL of that website into a unique IP (Internet Protocol) address.[3]

25.     An IP address is "a unique address that identifies a device on the internet or a local network."[4] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[5]

26.     When a visitor's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the webpage's URL. If the server fulfils this request, it issues an HTTP

---

[1] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Jan. 6, 2026).
[2] *Id.*
[3] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Jan. 6, 2026).
[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Jan. 6, 2026).
[5] *Id.*

response (the "HTTP Response"), which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the visitor's browser.[6]

28.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

28.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[7] as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters*[8]

29.    Website owners or web developers write and manage the URLs for their websites.

30.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[9] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

---

[6] *Id.*

[7] To see examples of how Defendant used parameters to provide additional information here, *see infra,* Section C(2).

[8]    *What    is    a    URL?,*    MOZILLA,    https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan. 6, 2026).

[9] *Id.*

31.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[10] Today, UTF-8 is the Internet's most common character encoding.[11]

32.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[12] To demonstrate:



*Figure 21 – Demonstrating URL encoding and decoding[13]*

33.     Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[10] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Jan. 6, 2026).

[11] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Jan. 6, 2026).

[12] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Jan. 6, 2026).

[13] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Jan. 6, 2026).



*Figure 32 – Sample webpage used to demonstrate a webpage URL*



*Figure 43 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 4)*



*Figure 54 – Decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

34.    After sending the Request URL, the server sends the HTTP Response to the visitor, and browser assembles the response packets sent by the server back into the HTML code of the webpage. The webpage code is then processed by the visitor's browser, as it arrives,[14] and "rendered" into a visual display according to the instructions of the webpage's source code,

---

[14] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built-in to the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last arrive, it is loaded and executed *before* the communication has finished transmitting. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

including HTML, CSS, and JavaScript code.[15] This is the visible, and usually interactable, website that appears on visitors' monitors.

35.    To provide more complex website functionalities, website developers will include more complex commands written in non-HTML programming languages such as JavaScript snippets, which are embedded or called within the HTML code.[16]

36.    Such complex tasks include order forms and inventory management, or code used to monitor and report visitor activity.

37.    In short, the Internet relies on a constant back and forth stream of requests to modify webpage content, navigate to new webpages, make internet purchases, or otherwise generally browse websites.

38.    Unbeknownst to visitors, as they browse and use the Website, the Tracking Tools capture and record both incoming and outgoing requests that make up visitors' communications with the Website.

## II.    Defendant's Use of Tracking Tools Allows Tracking Entities to Spy on Visitors, Including Plaintiff.

39.    Defendant operates the Website and has installed the Tracking Tools. These Tracking Tools operate invisibly, tracking Defendant's site visitors' activity surreptitiously.

40.    Generally, the Tracking Tools collect information about visitors' site activity when events specified by Defendant—like searching for services or checking availability of products in specific geographic areas—are triggered. The Tracking Tools associate this information back

---

[15]    *How the web works?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan. 9, 2025).
[16]    *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Jan. 6, 2026).

to the website operators that installed the Tracking Tools via some identification number, such as a Pixel ID.[17]

41.    Parameters added to events by Defendant help determine just how much data is collected, and how specific that data is.

42.    Parameters are strings of text that website owners add to a URL to track and organize their webpages.[18] URL parameters include key-value pairs formatted as "key=value":

1.    The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

2.    The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a visitor taking the action of adding a product to their online shopping cart)

---

[17] *See generally Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started/ (Dec. 24, 2025) (noting that the Pixel ID is part of the base code, which will result in the "download" of "a library of functions" related to that Pixel ID used "for conversion tracking"); *Conversion Tracking for Websites*, X Business, *How to create and access TikTok Pixel ID*, TikTok,_____https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites                https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (instructing visitors that they must insert their pixel ID into the base code for operation tracking); https://ads.tiktok.com/help/article/how-to-create-and-access-tiktok-pixel-id?lang=en (last visited Jan. 6, 2026) (instructing visitors to create Pixel ID to setup and link data tracking).
[18] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Jan. 6, 2026).



*Figure 6 - Diagram of a URL displaying how parameters function*[19]

43.    For instance, the Facebook Pixel (discussed and defined herein) transmission below shows that Defendant added a parameter to track events being triggered ("ev=PageView"), among other parameters.

---

[19] *Id.*



*Figure 7 - Facebook Pixel transmission displaying event parameter being collected and disclosed to Facebook*

## A.    The Facebook Pixel

44.    Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring visitor interactions on their websites, which allows Facebook to monitor visitors' activity directly from visitors' devices.

45.    The Facebook Pixel is a marketing tool that can only be added to a webpage's code by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[20]

46.    Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta), is generated.[21] This Pixel ID is used to initialize the Pixel, either by allowing Meta to fetch a pre-

---

[20]    *Set up and install the Meta Pixel,* FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Jan. 6, 2026).

[21]    *Id.*

determined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used receive the collected data when programming the Pixel directly into a website.[22]

47.    This Pixel ID must match "a known Pixel ID" in Meta's system,[23] and is transmitted by the Meta Pixel.[24]

48.    As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[25]

49.    Once added to a webpage, the Pixel begins intercepting information as soon as a visitor visits a webpage containing the Pixel, which is loaded onto the visitor's browser.[26]

50.    The Pixel is employed by Defendant to monitor, intercept, and then share visitor information with Facebook.[27] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website visitors to inform its targeted advertising campaigns,

---

[22] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan. 6, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[23] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Jan. 6, 2026).

[24] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 6, 2026).

[25] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan. 6, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[26] *See* Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet. (last visited Jan. 6, 2026).

[27] The Facebook Pixel allows websites to track visitor activity by monitoring visitor actions ("events") that websites want tracked and share a tracked visitor's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 6, 2026).

enhancing marketing effectiveness, and increasing the chance of converting visitors into paying customers.[28]

51.    This profile-building process is the central economic function of the Facebook Pixel. Meta expressly explains in its developer documentation that the Meta Pixel "relies on Facebook cookies" which enable Meta to match website visitors "to their respective Facebook User accounts." Once that match occurs, browsing activity transmitted from Defendant's Website is no longer anonymous website traffic data, but instead becomes account-linked behavioral data tied to a specific Facebook user profile.[29]

52.    Meta's Business Tools Terms further disclose that Meta processes "Contact Information" and other event data to match that information against user IDs and combine those IDs with event data. Pixel-transmitted data is integrated into Meta's broader user-identity system, thereby facilitating individualized profiling rather than simple analytics reporting.[30]

53.    The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location and finding the people who are most likely to take action and view content.[31]

54.    Importantly, the "events" tracked by the Pixel—such as PageView, button clicks, search inputs, address submissions, and conversion actions—reflect intentional user behavior. Meta's own documentation describes these as "standard events" and "conversion tracking"

---

[28] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan. 6, 2026).

[29] *See Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Feb. 19, 2026)

[30]    *See    Meta    Business    Tools    Terms,*    FACEBOOK, https://www.facebook.com/legal/technology_terms (last visited Feb. 19, 2026).

[31] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Jan. 6, 2026).

mechanisms used to measure and optimize user actions. When these events are paired with persistent identifiers stored in Facebook cookies, they allow Meta to infer not just what page was visited, but what the specific identified user was researching, considering, or attempting to purchase.[32]

55.    Once implemented on a website, the Facebook Pixel begins to share visitors' information the moment a visitor lands on the website.[33]

56.    Because the Pixel operates automatically and invisibly in the background of a webpage, visitors are typically unaware that their browsing actions are being transmitted to a third-party platform and integrated into an account-level advertising profile. The offensive nature of the intrusion lies not merely in the collection of data, but in the covert construction of a persistent digital dossier that reflects a person's interests, behavior, and intent across contexts.

57.    When a Facebook visitor logs onto Facebook, tracking cookies, including the c_user cookie, the datr cookie, and the fr cookie, are automatically created and stored on the visitor's device.[34] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook visitors.

58.    The c_user cookie, for example, contains a series of numbers (the visitor's Facebook ID, or "FID") to identify a visitor's profile.

---

[32] See Meta Business Tools Terms, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited Feb. 19, 2026).

[33] Meta confirms that Pixel activity is instantaneous, as troubleshooting "test events" allows website owners to "verify Pixel events in real time" from Facebook's Events Manager dashboard. *Connect your Squarespace account to Meta*, FACEBOOK, https://www.facebook.com/business/help/205579500465861 (last visited Feb. 19, 2026).

[34] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Jan. 6, 2026).



*Figure 8 – Sample c_user cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

59.    The FID can simply be appended to www.facebookcom/ to navigate to the visitor's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 10*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:



*Figure 9 -- Sample Facebook account created by Plaintiffs' counsel to investigate the Facebook Pixel, with FID highlighted in URL*

60.     The Pixel tracks visitor-activity on web pages by monitoring events,[35] which when triggered, causes the Pixel to automatically send data – here, visitors' sensitive information – directly to Facebook.[36] Examples of events utilized by websites include: (i) a visitor loading a page with a Pixel installed (the "PageView event");[37] (ii) when a visitor views clicks on the website (the "Site Clicked" event);[38] (iii) when a visitor clicks a pre-designated button (the "SubscribedButtonClick" event); (iv) when a visitor sends the Website their addreess (the "AddressBar" event); (v) when a visitor searches primary service hub cities for available services ("Check Availability Address Field Clicked" and "Goal Tracking") (collectively with PageView event, Site Clicked event, SubscribedButtonClick event, and AddressBar event, the "Pixel Events").[39] The Website utilizes all these enumerated Pixel Events.[40]

61.     Defendant's use of the Pixel also transmits its unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "281350368013978."

62.     Defendant uses the Facebook Pixel to monetize its Website visitors' Sensitive Information.

---

[35]     *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 6, 2026).

[36] *See generally id.*

[37]     *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jan. 6, 2026).

[38]     *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Jan. 6, 2026).

[39] *Id.*

[40] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Jan. 6, 2026).

63.     Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of visitors' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

64.     Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a visitor's journey on the Website from *Figure 9*.





*Figure 10 – Facebook Pixel tracking a visitor landing on the webpage from Figure 9 through the "PageView" event*



24



*Figure 11 – Facebook Pixel tracking a visitor viewing the page from Figure 9 through the "SiteClicked" event*



*Figure 12 – Facebook Pixel tracking a visitor's click choices when navigating to the sample webpage from Figure 9 through the "SubscribedButtonClick" event*



*Figure 13 – The AddressBar event sending Facebook an address entered into the Website*

65.    When a business applies with Facebook to use the Facebook Pixel, it is provided with detail about its functionality, including with respect to Sensitive Information.[41]

66.    To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

67.    The Facebook Terms informs website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[42]

---

[41] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 6, 2026) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook Visitor accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[42] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGod nMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan. 6, 2026).

68.    The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against visitor IDs, as well as to combine those visitor IDs with corresponding [Pixel Event information]."[43]

69.    Facebook directs parties implementing the Facebook Pixel—here, Defendant—to encrypt request information[44] *before* data can be shared.[45]

70.    Facebook further provides Facebook Pixel visitors, such as Defendant, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

71.    Facebook educates or reminds Facebook Pixel visitors of their responsibility to inform their visitors of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[46]

72.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel, and ignored Facebook's warnings to safely handle its visitors' data and to warn its visitors that the Website would disclose information in a manner that threatened visitors' Sensitive information.

---

[43] *Id.*
[44] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method which makes visitors' information visible. *See id.*
[45] *Id.*
[46] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Jan. 6, 2026).

73.      Regulatory authorities have recognized the privacy implications of such tracking and profiling. The Federal Trade Commission's 2024 Staff Report on Social Media and Video Streaming Services describes these business models as engaging in "vast surveillance" that collects and monetizes detailed behavioral data to build user profiles for advertising purposes.[47]

**B.      Google Tracking Tools**

74.      Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

75.      Like the Facebook Pixel, Google Analytics ("GA") collects data about visitor interactions with a website from visitors' browsers and in real-time.[48] That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[49]

76.      GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[50] Notably, Google notifies web developers that developers should provide "visitors with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[51]

---

[47] *See A Look Behind the Screens Examining the Data Practices of Social Media and Video Streaming Services REPORT*, FTC https://www.ftc.gov/system/files/ftc_gov/pdf/Social-Media-6b-Report-9-11-2024.pdf (last visited Feb. 19, 2026).

[48]          *See      Realtime      pages      report*,      GOOGLE, https://support.google.com/analytics/answer/15315925?hl=en (last visited Feb. 19, 2026).

[49] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Jan. 6, 2026).

[50]          *About      the      Google      tag*,      GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Jan. 6, 2026).

[51] *Id.*

77.    Google provides optional features such as "Google Signals," which allows cross-device tracking and aggregation of website activity with data from signed-in Google users for advertising purposes. Through Google Signals, website activity can be associated with user accounts across devices and sessions, enhancing the ability to construct persistent behavioral advertising profiles.[52]

78.    GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for visitor disclosure to website developers, including Defendant.

79.    To use GA the website operators must include the specific Google Tag ID associated with their websites, which allows Google to link the collected data back to their profile on Google products.[53]

80.    Defendant's Google Tag ID is included in transmissions sent to and from visitors' devices, as seen in *Figure 14*—the HTTP request URL contains the Google Tag ID, listed after "tid=", and referenced as "G-1YSRNY3CJN".

81.    Here, Defendant added GA to the Website. That implementation caused Plaintiffs' communications with the Website to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:

---

[52] *Activate Google signals for Google Analytics properties* https://support.google.com/analytics/answer/9445345?hl=en#zippy=%2Cin-this-article (last visited Feb. 20, 2026).

[53]    *About    the    Google    Tag* https://support.google.com/tagmanager/answer/11994839?hl=en&ref_topic=14595647&sjid=11744702880709055388-NA (last visited Jan. 7, 2026).



*Figure 14 – Test search made on the Website resulted in sharing search terms with Google Analytics*

82.    After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

83.    This monetization is accomplished through behavioral audience segmentation and remarketing tools that use prior website activity to predict future purchasing intent. Through remarketing, individuals who visited Defendant's Website may later be targeted across the Google advertising network based on their prior interactions.[54]

## III.    Plaintiffs Did Not Consent to be Tracked by Defendant's Use of the Tracking Tools.

84.    The Tracking Tools actively began to track visitors the moment they arrived on the Website.

---

[54] *Remarketing, GOOGLE* https://developers.google.com/tag-platform/devguides/remarketing (last visited Feb. 20, 2026).

85.    Visitors were, therefore, being tracked as soon as they landed on the Website home page.

86.    Defendant's Website includes a small cookie pop-up that notifies Website visitors that the Website uses "cookies to improve [visitors'] experience, serve personalized ads or content, and analyze [Defendant's] traffic." This pop-up ends with a hyperlink titled "Learn More" that redirects to Defendant's privacy policy.

87.    Defendant's privacy policy clearly claims to "limit[] the information collected about [visitors] to what is needed for conducting business, including the offering of products and services that might be of interest to [visitors]."[55]

88.    Defendant is clear that users "may choose to provide" personally identifiable information (PII), and does not "[c]ollect PII from [visitors] unless [visitors] provide it to [Defendant] . . . ."[56] Kinetic emphasizes that it does not "[s]ell any customer data, . . . PII or otherwise, to third parties."[57]

89.    However, Defendant claims that it may disclose PII to third parties to "assist [Defendant] in . . . providing Kinetic-related products and services to [visitors], . . but PII may not be used by the third parties for any other purpose[.]"[58]

90.    Defendant's privacy policy goes on to note that, in addition to PII, Defendant or third-party partners "may collect non-personal information automatically when you visit Kinetic websites" or "other third-party sites[.]"[59] This information includes domain names, browser

---

[55] *Privacy Policy*, https://www.gokinetic.com/about/legal/privacy-policy ,KINETIC (last visited May 8, 2026).

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

information, computer operating system information, and web page information, collected via "cookies," "web beacons," and "other data technologies."[60]

91.     Section N of Defendant's Privacy Policy defines cookies as "small, encrypted data strings our server writes to your hard drive that contains your unique Kinetic User ID."

92.     Section N of Defendant's Privacy Policy defines web beacons as "small graphic images imbedded in a webpage or email."

93.     Defendant's Privacy Policy fails to disclose that web beacons *appear* as small graphic images, but actually contain JavaScript code that calls on a host of monitoring tools to be downloaded to and operate from visitors' browsers.

94.     Defendant's Privacy Policy fails to disclose the use of tracking cookies, many of which identify users by allowing Facebook to link visitors to their collected data, including Meta's c_user cookie, datr cookie,[61] and fr cookie.[62]

95.     Defendant's Privacy Policy thus falsely assures visitors that these cookies only "contain[] your unique Kinetic User ID."[63]

96.     Indeed, Kinetic solicits Tracking Entities to collect personally identifiable information automatically (in contravention of Section G of the Privacy Policy), via cookies and

---

[60] *Id.*

[61] The datr cookie contains "a unique identifier for [a visitor's] browser . . . [and] has a lifespan of two years." *Security, site and product integrity*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/version/cookie_policy_2022/?subpage=subpage-1.2 (last visited Jan. 6, 2026).

[62] The fr cookie contains an encrypted Facebook visitor ID and browser ID, and has a lifetime of 90 days on a visitor's device. *See Cookie Policy*, BMW, https://bavarianmotorcars.com/en/cookie-policy (last visited Jan. 6, 2026); *Advertising, recommendations, insights and measurement*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last visited Jan. 6, 2026).

[63] *Privacy Policy*, https://www.gokinetic.com/about/legal/privacy-policy ,KINETIC (last visited May 8, 2026).

web beacons (operating well beyond the definition of Setion N of the Privacy Policy) where that information is used to match visitors' activity with their identity and build marketing profiles that that are used by Tracking Entities to market to visitors, not just Kinetic (in contravention of Section F of Defendant's Privacy Policy).

97.    Reasonable visitors, including Plaintiffs, expected Defendant to abide by the privacy practices it established in its Privacy Policy, and that their PII would not be automatically collected and used by Tracking Entities at Defendant's invitation.

## TOLLING

98.    Defendant's conduct tolled the statutes of limitations applicable to Plaintiffs' and the Class's claims, based on delayed discovery.

99.    Plaintiffs and Class Members did not know, and could not have known, that the Tracking Tools disclosed their information and communications to Tracking Entities when they used the Website. Reasonable diligence would not have revealed Defendant's conduct.

100.    Defendant embedded the Tracking Tools into the Website without disclosure, providing no indication that communications would be shared with Tracking Entities.

101.    Defendant possessed exclusive knowledge that the Tracking Tools would disclose protected information and confidential communications. Defendant failed to disclose that interacting with the Website would result in disclosure of Sensitive Information to Tracking Entities.

102.    The technical nature of the Tracking Tools prevented the discovery of the full scope of Defendant's conduct. No disclosures or visible indicators alerted a reasonable consumer to interception or disclosure.

34

103.    Plaintiffs and Class Members first learned of Defendant's conduct through investigation conducted in preparation for this action.

## CLASS ACTION ALLEGATIONS

104.    Plaintiffs brings this action individually and on behalf of the following Class:

All persons in the United States who visited the Website that had their Sensitive Information improperly disclosed to Tracking Entities through the use of the Tracking Tools (the "Class").

105.    Specifically excluded from the Classes are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

106.    Plaintiffs reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

107.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

108.    Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

109.    Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, used the Website and had their Sensitive Information collected and disclosed by Defendant.

110.    Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have no interests antagonistic to, nor in conflict with, the Classes. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

111.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

112.    Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

a.    Whether Defendant collected Plaintiffs' and the Class's Sensitive Information;

b.    Whether Defendant unlawfully disclosed and continues to disclose the Sensitive Information of Visitors of the Website

c.    Whether Defendant's disclosures were committed knowingly; and

d.    Whether Defendant disclosed Plaintiffs' and the Classes' Sensitive Information without consent.

113.    Information concerning Defendant's Website's data-sharing practices is available from Defendant's or third-party records.

114.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

115.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

116.    Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

117.    Given that Defendant's conduct is ongoing, monetary damages are insufficient, and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I - VIOLATION OF THE FEDERAL WIRETAP ACT
### 18 U.S.C. § 2510, et seq.

118.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in all preceding paragraphs of this Complaint.

119.    Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

120.    The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception, disclosure, or use of wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511(1)(a)-(d). This prohibition extends to direct violations or the procurement of third parties to accomplish such violations.

121.   The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

122.   The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

123.   The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

124.   The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

125.   The detailed URLs, including the parameters contained therein, constitute the contents of Plaintiffs' and Class Members' electronic communications with the Website.

126.   The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

127.   Plaintiffs, Defendant, and Tracking Entities are "persons" within the meaning of the Wiretap Act.

128.   The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

129.   The Tracking Entities were procured by Defendant to  intercept, record, and use the contents of Plaintiffs' and Class Members' electronic communications with Defendant's

Website.

130. During the relevant time period, Plaintiffs' and Class Members' communications with the Website were monitored, recorded, copied, and re-transmitted to the Tracking Entities in real-time from Plaintiffs' and Class Members' devices, as they were transmitted to the Website.

131. Plaintiffs' electronic communications with the Website were intercepted by Tracking Entities without Plaintiffs' consent. Defendant explicitly denied any disclosure, sharing, or exposure of Plaintiffs' and Class Members' identifiable information for marketing purposes, yet procured the Tracking Entities to intercept and monetize Plaintiffs' and Class Members identifiable information. The Tracking Entities combined Plaintiffs' and Class Members' Sensitive Information with data collected about them across the internet and used it for advertising, analytics, and marketing optimization, allowing Defendant, Tracking Entities, and other website owners to more effectively target Plaintiffs and Class Members with advertising.

132. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages; logged into their accounts; reviewed or updated account information; checked balances due; viewed, downloaded, or paid monthly bills and invoices; scheduled a technician appointment; searched for internet plans; or otherwise communicated information to the Website through their browser.

133. At all relevant times, Defendant acted knowingly, wilfully, and intentionally. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on the Website and understood that doing so would result in the interception of visitors' communications by Tracking Entities.

134. Plaintiffs were not asked to consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. Defendant

misled Plaintiffs in the privacy policy by telling them that their Sensitive Information would not be shared.

135.    Defendant aided and abetted the Tracking Entities in intercepting Plaintiffs' communications with the Website, as well as their use to build personal profiles of the Plaintiffs for a criminal and tortious purpose, by invading their privacy.

136.    The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

137.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c.    reasonable attorneys' fees and costs.

## COUNT II - INVASION OF PRIVACY

138.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in all preceding paragraphs of this Complaint.

139.    Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

140.    The tort of intrusion upon seclusion requires (a) an intentional intrusion (b) into a place, conversation, or matter as to which the plaintiff had a reasonable expectation of privacy, and (c) that the intrusion be highly offensive to a reasonable person.

141.    By purposely causing the Tracking Tools to be placed on visitors' browsers and devices to allow Tracking Entities to intercept and transmit visitors' Sensitive Information despite

its representations concerning user privacy, Defendant intentionally intruded upon the solitude and seclusion of Plaintiffs and Class Members.

142.     Plaintiffs and Class Members had an objectively reasonable expectation of privacy in their Sensitive Information with the Website because Defendant represented that their personal information would not be collected and shared in the manner in which it did so via its use of the Tracking Tools.

143.     Defendant's intrusion, placing Tracking Tools and enabling Tracking Entities' access to visitors' Sensitive Information despite its representations in its Privacy Policy was highly offensive to a reasonable person.

144.     As a direct and proximate result of Defendant's intentional intrusion, Plaintiff and Class Members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

## COUNT III - UNJUST ENRICHMENT

145.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in all preceding paragraphs of this Complaint.

146.     Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

147.     Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

148.     Defendant retained those benefits under circumstances in which the information was collected and transmitted without valid consent. The information was collected and transmitted in breach of Defendant's representations to visitors. Defendant's retention of those benefits is unjust.

149.    Plaintiffs and Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and Class Members are entitled to the relief set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

1.    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

2.    For an order declaring the Defendant's conduct violates the statutes referenced herein;

3.    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

4.    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website visitors;

5.    An award of statutory damages or penalties to the extent available;

6.    For damages in amounts to be determined by the Court and/or jury;

7.    For pre-judgment interest on all amounts awarded;

8.    For an order of restitution and all other forms of monetary relief;

9.    An award of all reasonable attorneys' fees and costs; and

10.    Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

DATED: May 8, 2026                          Respectfully submitted,

_Samuel R. Jackson_

Samuel R. Jackson (AR2013247)
sjackson@cbplaw.com
**CARNEY BATES & PULLIAM, PLLC**
1 Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: 501-312-8500
Facsimile: 501-312-8505

Mark S. Reich*
mreich@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*_pro hac vice_ forthcoming

_Attorneys for Plaintiffs and the Proposed Class_