**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**ROSELIA GONZALEZ; JOSH BROTHEIM; NATHANIEL GRIFFIN; DEBBIE PADGETT; MICHELLE COX; and MILTON KING, On Behalf of Themselves and All Others Similarly Situated** **PLAINTIFFS**

**v.** **CASE NO. 4:26-cv-473-KGB**

**UNITI SERVICES, LLC d/b/a KINETIC** **DEFENDANT**

**BRIEF IN SUPPORT OF UNITI SERVICES, LLC'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

## I. Introduction

Plaintiffs are customers of Uniti Services, LLC d/b/a Kinetic ("Kinetic"), an internet service provider that delivers high-speed internet, phone, and television services. Plaintiffs' claims arise from their use of Kinetic's website in furtherance of their relationship with Kinetic as customers. At multiple points in their relationship with Kinetic—including when they ordered services, visited Kinetic's website, received monthly invoices, and continued using and paying for Kinetic's services after receiving repeated notice of the governing Terms and Conditions—Plaintiffs agreed to a broad, mandatory arbitration provision requiring that all disputes related to Kinetic's services, equipment, service orders, and agreements be resolved through binding arbitration rather than in court. Yet, in this action, Plaintiffs seek to litigate those very types of claims on behalf of a putative class when they expressly agreed to resolve such claims on an individual basis through arbitration. Because the Federal Arbitration Act ("FAA") requires enforcement of valid arbitration agreements like the one here, and because Plaintiffs' claims fall

squarely within the scope of the arbitration agreement, the Court should compel arbitration and stay these proceedings pending arbitration.[1]

## II. Factual Background

Kinetic is an internet service provider delivering high-speed fiber internet, phone service, and digital TV packages to residential customers as well as similar services for small, medium, and large businesses, and government agencies. *See* Declaration of Christopher Duong, attached hereto as **Exhibit 1** (hereinafter "Duong Decl."), ¶ 2. Kinetic owns and operates a website at www.gokinetic.com, which allows visitors to browse information about internet and telecommunications services, manage customer accounts, and access support, among other things. *Id.*, ¶ 3.

### A. *The Named Plaintiffs*

According to the Complaint, "Plaintiffs accessed and used [Kinetic]'s website on multiple occasions for its intended consumer purposes, including managing their kinetic accounts, reviewing service information, scheduling or managing technician appointments, and engaging in other service-related activities." Compl. ¶ 5. Indeed, Kinetic's records reflect that the Plaintiffs ordered services from Kinetic by telephone. Duong Decl., ¶¶ 23-33.[2] When ordering the services, they were verbally advised of the Terms and Conditions, and a confirmation email was sent to them afterward that referred to, and linked to, the Terms and Conditions. *Id.*, ¶ 14. The Terms and Conditions clearly stated that use of, and payment for, Kinetic's services constituted agreement to the Terms and Conditions, and Plaintiffs thereafter continued to use and pay for Kinetic's

---

[1] Defendant's motion to compel arbitration satisfies its obligation to respond to Plaintiffs' Complaint. *See Lamkin v. Morinda Props. Weight Parcel, LLC*, 440 F. App'x 604, 607 (10th Cir. 2011). Defendant reserves all other available defenses.

[2] Josh Brotheim alleges that he is a customer of Kinetic, but Kinetic is unable to locate records under that specific name. *See* Compl. ¶ 13.

services. *Id.*, Duong Decl., Attachment B, § 2. Additionally, most Plaintiffs created online Go Kinetic accounts to manage their bills and services. *Id.*, ¶¶ 23-33. Further, Kinetic's records show that Plaintiffs each received and paid monthly invoices that reminded them—not once but twice—that continued use of services constitutes an agreement to the Terms and Conditions. *Id.*, ¶ 19. Additionally, in each customer's May invoice was an Annual Notice of Terms and Conditions that advised the customer that "[c]ontinued use of any Kinetic services means you have agreed to the current Online Terms." *Id.*, ¶ 20. For each Plaintiff, services were provided to addresses located in the state of Georgia, and Plaintiffs allege that they are residents of Georgia. Compl. ¶¶ 12-17.

### B. *Terms and Conditions*

The Terms and Conditions govern the relationship between customers and Kinetic. The Terms and Conditions are presented to customers in clear, unambiguous ways when customers sign up for Kinetic's services and then on a monthly basis thereafter. Customers who sign up for services over the phone are provided a link to the Terms and Conditions and verbally advised that the Terms and Conditions govern. Duong Decl., ¶ 14. For those who sign up online, the Terms and Conditions are presented at checkout, and the customer cannot checkout without affirmatively checking the box to indicate that they have read and agreed to the Terms and Conditions.[3] *Id.*, ¶ 15. Once services are requested, the customer receives a confirmation email, which again references and links to the Terms and Conditions. *Id.*, ¶ 16. Customers can choose to go paperless and manage their accounts online by creating an online account with login credentials. *Id.*, ¶ 17. Customers also are issued monthly invoices electronically or by mail. *Id.*, ¶ 19. Each invoice contains two separate disclosures, informing customers that use of Kinetic's services constitutes

[3] *Holley v. Bitesquad.com LLC*, 416 F. Supp. 3d 809, 822 (E.D. Ark. 2019) ("A clickwrap agreement is an assent process where a user is required to click "I agree" before completing a purchase but is not required to actually view or scroll through the contract or terms and conditions.").

an agreement to the Terms and Conditions. *Id.*, ¶ 20. The named Plaintiffs were presented with, and agreed to, the Terms and Conditions in these various ways.

The Terms and Conditions, to which Plaintiffs agreed, include a mandatory arbitration agreement and a class action waiver. Indeed, the Terms and Conditions themselves call immediate attention to these terms in the Dispute Resolution provision. In bold, capitalized letters, the Terms and Conditions declare that it "is especially important for you to read Section 3 (Dispute Resolution) carefully, as Section 3 provides for resolution of disputes through final and binding arbitration before a neutral arbitrator instead of in a court by a judge or jury or through a class or mass action." *Id.*, ¶ 10 and Attachment B, p. 1. Section 3, in turn, contains—again in bold, capitalized letters—a waiver of "any right to a trial by jury in a court of general jurisdiction and any right to participate in a class or mass action or consolidated action regarding a dispute except as provided in this section." *Id.*, ¶ 10 and Attachment B, § 3. Instead, disputes unable to be resolved directly with Kinetic must be resolved through arbitration or small-claims court, where applicable. Id., ¶ 10 and Attachment B, § 3(a)(ii). Dispute is defined broadly as "any claim or controversy related in any way to Kinetic's Services, including charges for Services, Equipment, Service Order(s), or our agreements pursuant to these Terms or any other agreements, whether the dispute: arises in tort, contract, by statute, or any other legal theory; arises under this or any prior agreement with us; or arises after your Services with Kinetic are terminated." *Id.*, ¶ 10 and Attachment B, § 3(a)(i).

C. *Additional Notice and Assent*

On top of the methods by which Plaintiffs were presented with and agreed to the Terms and Conditions described above, the website also puts users on notice of the Terms and Conditions. As Plaintiffs acknowledge in their Complaint, the Kinetic website employs a cookie notice banner that informs users that the website uses cookies, with a link redirecting the user to the website's

Privacy Policy. Compl. ¶ 2. It is a standard browsewrap agreement, whereby users are conspicuously notified of the website's terms and conditions and their continued browsing confirms assent to those terms and conditions.[4] Indeed, the notice banner to which Plaintiffs refer is conspicuously located in the bottom right-hand corner of the user's screen. Duong Decl., ¶ 4. It uses a standard font size, and it remains on the screen—even while the user scrolls—unless and until the user affirmatively assents to the Privacy Policy and incorporated Terms and Conditions by clicking the prototypical "x." *Id.*, ¶ 4.

The banner states: "We use cookies to improve your experience, serve personalized ads or content, and analyze our traffic. Learn more." *Id.*, ¶ 5. The "Learn more" portion of the text contains a hyperlink to Kinetic's Privacy Policy. *Id.*, ¶ 5. Importantly, the cookie banner is not the only means by which Kinetic provides notice of its policies and governing terms. Every page of the website also includes persistent footer links to Kinetic's Privacy Policy, Terms and Conditions, and Legal Notice. *Id.*, ¶ 9. Thus, visitors to the website encounter both the traditional footer links commonly associated with website terms and a separate, prominent banner that affirmatively draws users' attention to Kinetic's Privacy Policy.

The Privacy Policy discloses the types of personal and network-related information Kinetic collects from customers and website/app users; how it uses that information to provide services, marketing, security, and account management; and the choices users have regarding certain communications and data uses. *Id.*, ¶ 7 and Attachment A. It also covers topics such as information sharing practices, cookies and tracking technologies, security measures, children's privacy, legal compliance, breach notifications, and users' privacy rights and protections. *Id.*, ¶ 7 and Attachment

[4] A browsewrap agreement is one in which the agreement is part of the website and the user assents to the contract by use of the website. *See Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014)).

A. Critically, the Privacy Policy contains a "Dispute Resolution" provision, which states that "complaints that cannot be resolved between Kinetic and the User . . . will be governed by the current provisions of Kinetic's Terms and Conditions, or the terms of your written agreement with Kinetic, if applicable." *Id.*, ¶ 7 and Attachment A.

Kinetic thus not only put customers on notice of the Terms and Conditions at the time of purchase, but it also presents those Terms and Conditions multiple times over to customers and website visitors through the conspicuous website notice banner, the standard footer links, located where one would expect to find them on any website, the order confirmations, the online account setup process, and the customer's monthly invoices.

## III. Argument

### A. The Federal Arbitration Act Requires Plaintiffs' Claims To Be Arbitrated

The Federal Arbitration Act ("FAA")[5] requires a court to enforce arbitration agreements and to stay litigation that contravenes such agreements. *See* 9 U.S.C. §§ 3-4. The FAA provides that a written arbitration provision contained in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." *Id.* at § 2. Because the FAA reflects a strong policy favoring arbitration of disputes, arbitration agreements governed by the FAA are to be liberally enforced. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24

[5] The FAA expressly applies under the plain terms of the Terms and Conditions. *See* Duong Decl., Attachment B, § 3(a)(ii)(b) (providing that "the Federal Arbitration Act governs the interpretation and enforcement of this provision"). But the FAA would apply in any event, as the Terms and Conditions are between Kinetic, an Arkansas-based entity, and Georgia consumers. Therefore, it is a "contract evidencing a transaction involving commerce[.]" 9 U.S.C. § 2; *see also Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 277, 281 (1995) (explaining that FAA's phrase "involving commerce" is interpreted broadly to extend to the limits of Congress's power under the Commerce Clause, applying even if the parties did not contemplate an interstate commerce connection); *Leeper v. Altice USA, Inc.*, 722 F. Supp. 3d 893, 898 (W.D. Ark. 2024) (finding arbitration provision where Arkansas residents contracted with New York company evidenced transaction involving interstate commerce).

(1983) (stating that the FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements").

Section 3 of the FAA requires arbitration of this case. It provides that, when a plaintiff sues "upon any issue referable to arbitration under an agreement in writing for such arbitration," the court "shall" stay the action until arbitration is completed in accordance with the terms of the arbitration agreement. *See* 9 U.S.C. § 3. Section 4 of the FAA, in turn, empowers the court to compel arbitration according to the arbitration agreement. *Id.*, § 4. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

In considering a motion to compel arbitration under the FAA, the Court is limited to deciding two questions: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004). In considering these issues, "state contract law governs . . . whether an enforceable arbitration agreement exists between litigants," and federal law determines "whether the litigants' dispute falls within the scope of the arbitration agreement." *Donaldson Co v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731 (8th Cir. 2009) (citing *Daisy Mfg. Co., Inc. v. NCR Corp.*, 29 F.3d 389, 392 (8th Cir. 1994)). In deciding these questions, any doubt must be settled in favor of arbitration. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991).

Here, Plaintiffs entered into a valid and enforceable arbitration agreement, and the dispute falls within the scope of the agreement. Because both these factors are satisfied in this case, all claims in the Complaint must be arbitrated.

### B. The Arbitration Agreement Is Valid and Enforceable

The arbitration agreement is valid and enforceable under governing law. Under Arkansas law, a valid contract consists of (1) competent parties, (2) subject matter, (3) consideration, (4) mutual agreement, and (5) mutual obligations. *Leeper*, 722 F. Supp. 3d at 898-99.[6] There also must be "mutual asset between the parties—a so-called 'meeting of the minds.'" *Foster*, 15 F.4th at 863.

First, Plaintiffs do not dispute that they are competent parties, and competence is presumed under Arkansas law. *See Dunn v. Activision Blizzard, Inc.*, 749 F. Supp. 3d 976, 981 (2024) ("Competence is presumed and the burden of proving incompetence is with the Plaintiffs.").

Second, the agreement has definite subject matter: Kinetic's provision of internet and related telecommunications services to Plaintiffs, including the parties' rights and obligations arising from those services, the website, account access, invoices, and related disputes.

Third, there is consideration because Kinetic provided services to Plaintiffs, and Plaintiffs agreed to pay for and use those services subject to Kinetic's Terms and Conditions. *See McIlroy Bank & Trust Co. v. Comstock*, 13 Ark. App. 13, 16 (1984) ("It has been said that consideration is any benefit conferred or agreed to be conferred upon a promisor to which he is not lawfully entitled, or any prejudice suffered or agreed to be suffered by a promisor other than such as he is lawfully bound to suffer.").

Fourth, mutual agreement exists. "For a party to assent to a contract, . . . 'the terms of the contract, including an arbitration agreement, must be effectively communicated.'" *Altice USA, Inc.*

---

[6] To the extent Georgia law applies, the result would be the same. *See* Duong Decl., Attachment B, ¶ 23; *see also Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016) (explaining the under Georgia law, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." (quoting Ga. Code Ann. § 13-3-1)).

*v. Johnson*, 2023 Ark. App. 120, 8, 661 S.W.3d 707, 715 (2023) (quoting *Erwin-Keith, Inc. v. Stewart*, 2018 Ark. App. 147, at 10, 546 S.W.3d 508). "In the absence of direct communication between the parties, websites have employed some unique solutions to overcome the challenges of making internet contracts," including clickwrap agreements, browsewrap agreements, and "'variations in between.'" *Foster*, 15 F.4th at 863 (quoting Corbin on Contracts § 2.12[2]). These types of online contracts are "treated no differently than any other contract" in Arkansas. *Dunn*, 749 F. Supp. 3d at 981 (reviewing Arkansas law regarding online agreements and citing *Union Nat'l Bank of Little Rock v. Smith*, 240 Ark. 354, 356, 400 S.W.2d 652, 653 (1966)).

Where clickwrap agreements have been employed, "courts rarely find problems" because the user's assent is explicit. *Foster*, 15 F.4th at 863. When evaluating browsewrap agreements, courts conclude the website visitor assented when "there is adequate notice to create 'actual or constructive knowledge of the website's terms and conditions.'" *Foster*, 15 F.4th at 863 (quoting *Nguyen*, 763 F.3d at 1176). It is enough that a "website puts a reasonably prudent user on inquiry notice of the terms." *Id*. at 864. And putting a reasonably prudent website visitor on inquiry notice is accomplished when the "existence of the relevant terms are reasonably conspicuous to the user." *Id*. (quotes omitted). In similar fashion, an individual can also manifest assent to the terms of an agreement by paying monthly invoices when those invoices direct him or her to terms and conditions. *See Altice*, 2023 Ark. App. at *10.[7]

---

[7] Regarding online agreements, Georgia law is no different. *See, e.g.*, *Thornton v. Uber Technologies, Inc.*, 359 Ga. App. 790, 793-96 (2021) (recognizing that a conspicuous browsewrap agreement notifying users that account creation constitutes assent to hyperlinked terms and conditions can bind a user notwithstanding failure to read and that continued use of a service following receipt of updated terms can constitute assent); *see also Baker v. VGW US Inc.*, No. 4:26-CV-173 (CDL), 2026 WL 1894515, at *1 (M.D. Ga. July 1, 2026) ("In Georgia, clickwrap agreements and browsewrap agreements can bind an application user to the application's terms and conditions as long as there is conspicuous notice of the terms and notice of what conduct indicates assent to those terms.").

Plaintiffs were on actual notice because they were verbally informed of the Terms and Conditions over the phone at the time of purchase and were sent a confirmation email that referenced and linked to the Terms and Conditions. In those Terms and Conditions, it expressly states that continued use of, and payment for, Kinetic's services constitutes agreement to the Terms and Conditions. Duong Decl., Attachment B, § 2. Each of the Plaintiffs used and paid for Kinetic's services and thereby agreed to the Terms and Conditions, including the Dispute Resolution provision. And after services began, Plaintiffs received and paid monthly invoices that reminded them that continued use of Kinetic's services constituted agreement to the Terms and Conditions. *Id.*, ¶ 19. Arkansas law recognizes that assent may be manifested through payment of invoices that direct customers to governing terms. *Altice*, 2023 Ark. App. at *10.

The Terms and Conditions also made the arbitration agreement and class-action waiver conspicuous. They alerted customers in bold, capitalized language that Section 3 was "especially important" because it required final and binding arbitration before a neutral arbitrator rather than litigation before a judge or jury or through a class or mass action. Duong Decl., ¶ 11. Section 3 then repeated, again in bold, capitalized language, that customers waived the right to a jury trial and the right to participate in a class, mass, or consolidated action except as provided in that section. *Id.*, ¶ 11. Those terms were effectively and repeatedly communicated and accepted.

Even if the Plaintiffs were not customers that affirmatively assented through the multiple methods described above (they did), they were at a minimum on inquiry notice, which is enough to form an agreement. *Foster*, 15 F.4th at 864. Kinetic repeatedly and conspicuously communicated its Terms and Conditions to Plaintiffs. Plaintiffs allege that they each used the Kinetic website. Compl. ¶ 5. Upon first visiting its website, Plaintiffs were met with persistent footer links to its Privacy Policy, Terms and Conditions, and Legal Notice. Duong Decl., ¶ 9. The

website also displayed a conspicuous cookie banner that remained visible unless affirmatively closed and linked users to the Privacy Policy. *Id.*, ¶ 4. Both the cookie banner and the terms expressly directed unresolved disputes to Kinetic's Terms and Conditions or the user's written agreement with Kinetic. *Id.*, ¶ 5. Any reasonably prudent website visitor would have been on inquiry notice of the Terms and Conditions and the requirement to arbitrate upon first visiting Kinetic's website.

Fifth, the requirement of mutuality of obligations is satisfied. Kinetic assumes several concrete obligations in exchange for the customer's agreement to the Terms and Conditions, most significantly in the dispute resolution provision, where Kinetic commits to reimbursing the customer's JAMS filing fee upon commencement of arbitration, paying all JAMS fees if Kinetic itself initiates arbitration, conducting the hearing in the county of the customer's billing address, and setting a floor for the customer's award by paying the greater of the arbitrator's award or $5,000—plus the customer's attorneys' fees—if the award exceeds Kinetic's last written settlement offer, all while equally waiving its own right to a jury trial and class action and committing to the same dispute-resolution mechanism arbitration or small claims court. Duong Decl., Attachment B, §§ 3(b)(ii)–(iv).[8]

For all these reasons, all requirements of a valid contract are satisfied. Because Plaintiffs expressly agreed to the Terms and Conditions when ordering services, again when creating online accounts, and thereafter by continuing to use and pay for Kinetic's services after receiving invoices referencing those terms, the arbitration agreement is valid and enforceable under Arkansas law.

[8] Kinetic also makes certain commitments related to rates and fees. Duong Decl., Attachment B, §§ 5, 6, 22.

**C. Plaintiffs' Claims Fall Squarely Within the Scope of the Agreement**

Because there is a valid and binding agreement to arbitrate, the Court must next decide whether Plaintiffs' claims fall within the scope of the arbitration agreement. The arbitration provision in this case is broad and includes "any claim or controversy related in any way to Kinetic's Services, including charges for Services, Equipment, Service Order(s), or our agreements pursuant to these Terms or any other agreements, whether the dispute: arises in tort, contract, by statute, or any other legal theory; arises under this or any prior agreement with us; or arises after your Services with Kinetic are terminated." *Id.*, Attachment B, § 3(a)(i). Plaintiffs' claims unquestionably fall within the scope of the arbitration agreement.

The federal substantive law of arbitrability governs whether the dispute falls within the scope of the arbitration agreement. *Donaldson Co.*, 581 F.3d at 731. When determining whether a dispute is covered by the scope of an arbitration agreement, "absent some ambiguity in the agreement, 'the language of the contract defines the scope of disputes subject to arbitration.'" *Enderlin v. XM Satellite Radio Holdings, Inc.*, No. 4:06-CV-0032 GTE, 2008 WL 830262, at *16 (E.D. Ark. Mar. 25, 2008) (quoting *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002)). When making this determination, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 911 (8th Cir. 2010) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25). Arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 314 (2010) (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 650 (1986)). Thus, all "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H.*

*Cone Mem'l Hosp.*, 460 U.S. at 24.

In making the determination as to whether the claims fall within the scope of the arbitration provision, the Court examines whether the arbitration clause is broad or narrow. *See Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997) (determining arbitration clause at issue was broad because arbitration was available for claims both "arising from" and "relating to" the agreement). If the clause is broad, as it is here, the "liberal federal policy favoring arbitration agreements requires that a district court send a claim to arbitration . . . as long as the underlying factual allegations simply touch matters covered by the arbitration provision." *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008) (quotations and internal citation omitted).

Plaintiffs' claims fall squarely within the arbitration provision. The provision applies to "any claim or controversy related in any way to Kinetic's Services," including disputes arising in tort, contract, statute, or any other legal theory, disputes arising under the Terms or any prior agreement, and disputes arising even after services are terminated. Duong Decl., Attachment B, § 3(a)(i). That language is plainly broad. It encompasses any claim or controversy related in any way to Kinetic's services or agreements.

Plaintiffs' Complaint is based on their customer-related interactions with Kinetic's website, Kinetic's Privacy Policy, and Kinetic's alleged collection or use of information in connection with its website and services. Plaintiff Gonzalez alleges she used the website to "review her account information, check her balance due, and view and manage her monthly bills and invoices." Compl. ¶ 12. Plaintiffs Brotheim, Padgett, and Cox used the website for the same purposes as Gonzalez. Compl. ¶¶ 13, 15, 16. And Plaintiff Griffin used the website to "schedule a technician appointment." Compl. ¶ 14. And although Plaintiff Milton alleges that he used the

website to "explor[e] available internet service options[,]" (Compl. ¶ 17), Kinetic's records show that Mr. Milton is also an active Kinetic user. Duong Decl., ¶ 32.

These allegations do far more than "touch matters" covered by the arbitration provision, which is all that is required. *3M Co.*, 542 F.3d at 1199. Indeed, the Complaint itself relies on the website cookie notice and Privacy Policy—the same policy that directs unresolved disputes to Kinetic's Terms and Conditions. Plaintiffs' claims therefore relate directly to Kinetic's services, website, customer relationship, and governing agreements. Plaintiffs cannot show "with positive assurance" that the arbitration clause is not susceptible to an interpretation covering their claims. *Granite Rock Co.*, 561 U.S. at 314. To the contrary, such claims are expressly covered because they are controversies related to Kinetic's services, its website, its Privacy Policy, and its agreements with users and customers. Because the arbitration clause is broad, any doubts concerning its scope must be resolved in favor of arbitration. The Court should therefore compel Plaintiffs to arbitrate their claims.

Because the parties have a valid and enforceable agreement to arbitrate and the claims at issue fall squarely within the scope of the arbitration provision, the Court should stay the present action and compel Plaintiffs to arbitrate their claims. *See France v. Flagship Credit Acceptance, LLC*, Case No. 4:24-cv-00814-KGB, 2025 WL 2601517, at *10 (E.D. Ark. Sept. 9, 2025) (Baker, J.) (granting motion to compel arbitration when there was a valid and enforceable agreement to arbitrate and that the dispute in question fell within the scope of that agreement); *Intek Constr. Corp. v. Tegrity Contractors, Inc.*, Case NO. 5:25-CV-5211, 2026 WL 461572, at *2-4 (W.D. Ark. Feb. 18, 2026) (granting motion to compel arbitration when the arbitration clause was valid and enforceable and the parties agreed that the claims in the amended complaint fell within the agreement to arbitrate); *see also Martinez v. GAB.K, LLC*, 741 F. Supp. 3d 26, 36 (S.D.N.Y. 2024)

(holding that "[a]rbitration clauses that are broad, like the one here, covering 'any and all disputes and claims which arise out of or relate to [plaintiff's] employment,' should be interpreted broadly to cover any disputes arising out of the employment relationship).

## IV. Conclusion

For the foregoing reasons, Uniti respectfully requests that this Court grant its Motion to Stay Proceedings and Compel Arbitration, compel this matter to arbitration, stay the case pending arbitration, and for any and all other just and proper relief.

Respectfully submitted,

Katherine C. Campbell, Ark. Bar No. 2013241
Bradley S. Runyon, Ark. Bar No. 2005119
FRIDAY, ELDREDGE & CLARK, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, AR 72758
Office: (479) 695-6040
Facsimile: (501) 244-5389
kcampbell@fridayfirm.com
brunyon@fridayfirm.com

*Attorneys for Plaintiff, Uniti Services, LLC d/b/a Kinetic*